*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MCCRARY, Minors.

UNPUBLISHED
March 16, 2023

No. 362421
Wayne Circuit Court
Family Division
LC No. 2018-000450-NA

Before: RICK, P.J., and SHAPIRO and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to his two children, KAM and KRM, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent).[1] We affirm.

## I. FACTUAL BACKGROUND

On March 27, 2018, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over three-year-old KAM and two-year-old KRM. The petition alleged that (1) 26-year-old respondent had not provided financial support for his children since December 2017, (2) respondent had not visited his children since December 2017, (3) respondent was convicted of, and subsequently incarcerated for, drug-related offenses,[2] with an initial parole eligibility date of May 2020, and (4) the family had numerous prior contacts with Child Protective Services (CPS) due to allegations related to improper supervision, substance abuse, domestic violence, physical abuse, physical neglect, and threatened harm. The petition further alleged that on February 8, 2018, following a referral to CPS concerning the neglect of the

---

[1] The trial court also terminated the children's mother's parental rights, but she has not appealed.

[2] Respondent was convicted of two counts of maintaining a drug house, MCL 333.7405(1)(d), and one count each of delivery/manufacturing 45 or more kilograms of marijuana, or 200 plants or more, MCL 333.7401(2)(d)(*i*), and conspiracy to commit that crime, MCL 750.157a(a). Respondent denied that he was convicted as a second-felony offender.

children, police found them unclothed and shivering in a home without heat, partial electricity, and no food.

Following a preliminary hearing, the court authorized the petition. Although the worker had received relatives' names for placement, DHHS maintained that they were not fit at that time. Even so, the children were placed with respondent's sister in March 2018.[3]

Respondent subsequently pleaded to the petition, admitting that he was incarcerated for drug convictions in December 2017 and that his earliest parole eligibility date was May 20, 2020. Respondent further admitted that he was unable to care and provide for his children due to his incarceration. In light of respondent's admissions, the court determined that there were statutory grounds to exercise jurisdiction over the children. It then ordered respondent to complete numerous Department of Corrections programs and provide DHHS with updates and certificates.

The court continued to hold dispositional review hearings to address reunification efforts. In August 2019, DHHS petitioned for termination. During an October 2019 hearing, respondent testified that he had completed almost all of his programs and continued to be eligible for parole in May 2020. Respondent engaged in weekly telephone contact with the children. If the court did not terminate respondent's parental rights, DHHS would offer additional recommendations for respondent, including maintaining suitable housing and income, individual therapy, a psychological examination, drug screens, and a parenting class. The trial court determined that DHHS had not met its burden of proof as to respondent, but cautioned him to work toward parole because his children needed permanence.

The children were removed from their aunt's care, but returned to her home in early December of 2019. Respondent was paroled in May 2020. In October 2020, DHHS removed the

---

[3] After mother was arrested, the children were placed in a temporary safety plan with their paternal grandmother for approximately 30 days. Nevertheless, her three-bedroom home was determined to be unsuitable and she was not licensable due to her criminal history, including convictions for domestic violence and arrests for felony assault and a public order matter. The home's residents included grandmother's stepfather, who also had a criminal history, respondent's sister, who did not have a criminal history, and her two children. The children's grandmother was unemployed and dependent on her stepfather for financial support. Although the group hoped to move to another home, it required plumbing and had exposed wiring. Once that home was completed, evaluated, and approved, the worker hoped to place KAM and KRM there, but, until that occurred, the worker wanted to place the children in foster care.

The referee recommended ordering the worker to meet with DHHS's section manager to confirm that its policy necessitated removal of the children in light of their earlier placement with grandmother. After engaging in the court-ordered consultation, the grandmother agreed not to reside in the home and respondent's sister, who was unlicensed, would care for them.

children from their aunt's care for a second time.[4] This action was prompted by three separate CPS complaints. The first complaint was against respondent. His new significant other accused him of attempting to kill her while her children, who were five and one, and KRM were sleeping in the home. More specifically, the woman alleged that respondent, who may have been drinking, choked her after he placed a belt around her neck. Respondent then fled. Respondent's actions caused the woman's eyes to become bloodshot and blackened. The next morning, the older children in the home noticed her injuries.[5] The woman reported that additional violence had also occurred, but she was too afraid to report it due to her fear of respondent. The second CPS complaint alleged that KAM had not signed in virtually since school began. The third complaint alleged that paternal grandmother, who had a substance abuse history, was under the influence while caring for the children.[6] The home was in disarray and the children had multiple scratches on their bodies. The worker visited the home unannounced, found it in a deplorable state, and observed several marks on the children that they attributed to a cat.

DHHS recommended that respondent's visits be supervised and that the children be placed with fictive kin. The court noted that DHHS already had the discretion to direct visitation be supervised and approved the fictive-kin placement. The court asked DHHS to access respondent's home after respondent indicated that it was suitable for the children. The court also requested an update regarding the continuing investigations into the CPS complaints.

By February 2021, respondent was not in compliance with his parent-agency agreement. He had not maintained consistent contact with DHHS. And, despite respondent's request that his home be evaluated, respondent reported that he was moving and no home evaluation was scheduled. Notably, respondent missed 14 scheduled visits with the children and attended only three. KAM had been placed with fictive kin and the plan was to move KRM there as well. DHHS asked the court to change the permanency plan from reunification to adoption because it planned to file a termination petition. The court agreed to move toward adoption and directed DHHS to file a supplemental petition for permanent custody.

On March 29, 2021, DHHS filed its second petition to terminate respondent's parental rights. The petition alleged that respondent: (1) failed to benefit from his services, (2) failed to provide DHHS with his parole officer's contact information to verify his participation in drug and alcohol screenings, (3) failed to obtain suitable housing and did not permit DHHS to evaluate his housing on seven different occasions, (4) failed to attend 16 out of 45 scheduled visits, (5) engaged in unapproved overnight visits, and (6) did not attend two hearings.

---

[4] The record is somewhat contradictory because there is testimony that the children were removed in July 2020, and, at some point, were placed with paternal grandmother. However, the court's October 27, 2020 order reflects that the children were removed from their aunt's care in October.

[5] Respondent was not authorized to have unsupervised overnight visitation and the caregiver admitted that both children had unauthorized overnight visits with him.

[6] Again, the record is not entirely clear as to whether grandmother was serving as the children's caretaker, and, given the former worker's testimony at the October 14, 2020 hearing, the allegations in these two CPS complaints may have related to the children's aunt.

At the next hearing in April of 2021, respondent again reported that he had a suitable home, fulltime employment, and was finishing his parole. Respondent asked that the children be placed with him. The court urged DHHS to follow up on respondent's request to inspect his home.

Unable to obtain contact information from respondent, the worker tracked down respondent's parole agent's information and reached out to him. The agent informed the worker that respondent was noncompliant with his parole requirements and agreed to accompany the worker on a home visit. Respondent contacted the worker, explained that he had moved, and provided an address for the worker to visit. On April 30, 2021, the parole officer and the worker went to the address provided; it was not the address that respondent had provided to his parole agent. The worker conducted the home assessment and discovered that the home was next door to KAM's fictive kin placement, that respondent was living with his father, who was a registered sex offender,[7] and that there were no beds for the children.

Respondent previously told the worker that he was participating in drug screens and substance abuse therapy as conditions of his parole. But the parole officer reported that respondent tested positive for methamphetamine once,[8] that respondent had not participated in drug screens, and that respondent had not engaged in substance abuse therapy. Respondent was also arrested four times for driving without a license, and, on one of those occasions, he tested positive for alcohol.

Upon seizing respondent's phone during the home assessment, the parole officer reported finding images of respondent holding a firearm inside the home and evidence suggesting that respondent was still using and selling drugs. Respondent had also videotaped the children's mother while she was having a seizure and saying, "[T]his is what an overdose looks like."[9]

In total, respondent committed 13 parole violations. He was charged with four—drug use, drug selling, driving under the influence, and having a firearm. Respondent was arrested and eventually returned to prison for an 18-month extension.

During his reincarceration, respondent was required to participate in an advanced substance abuse program and incurred six additional misconducts. One of those misconducts involved

---

[7] Respondent later testified that his father did not live at the home, but lived next door. Respondent also denied telling the worker that he lived at the address. Instead, he told her he planned to move to the address once his parole ended.

[8] Respondent testified that he "was out partying one night and it was just . . . a mishap." Respondent "caught" an operating under the influence "that same night."

[9] According to the worker, when confronted about the video, respondent told his parole officer, mother was simply having a seizure. And respondent testified that he told emergency responders that mother had used drugs by way of background, but informed them she was having a seizure. Respondent further denied telling anyone, except for one of his friends, that mother had overdosed.

substance abuse after he began the advanced substance abuse program. Later, however, respondent successfully completed the program.

At the September 2021 hearing respondent was not present. It was reported that he declined to get out of bed. By early November, KAM had been removed from the fictive kin placement because of concerns over drug use, improper supervision, and contact with the children's paternal grandfather, a registered sex offender.

The termination hearing began in February 2022. During the children's time in care, KAM had 13 placements; KRM had six. In late November or early December 2021, KAM, who had special needs, was placed with a paternal cousin,[10] who had four children, and, therefore, had no room for KRM. Respondent's cousin testified that she supervised phone visitations between respondent and KAM, who talked almost every day.

Respondent's case manager reported that respondent's earliest release date was October 29, 2022. During the 11 months respondent was on parole, he missed 16 of 45 visits. Once returned to prison, respondent did not have appropriate housing and he no longer had income.

The worker testified that the past four years had been traumatic for both children and respondent had not played an active role in parenting them. Respondent had not rectified the conditions that led to the children being placed in care despite having years to do so and posed a risk of harm to them. The worker further opined that the children deserved an opportunity at stability.

Following an additional hearing in May 2022, the trial court determined that DHHS presented clear and convincing evidence to support termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). The trial court also determined that DHHS established, by a preponderance of the evidence, that termination of respondent's parental rights was in the children's best interests. The court entered the order terminating respondent's parental rights on June 7, 2022, which respondent appealed.

## II. STATUTORY GROUNDS

Respondent contends that the trial court clearly erred when it determined that DHHS presented clear and convincing evidence to support termination of his parental rights. We disagree.

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court reviews a trial court's factual findings and ultimate determinations on the statutory grounds for termination for clear error. *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to

---

[10] The cousin's grandfather was respondent's grandmother's brother.

the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

## A. MCL 712A.19b(3)(c)(*i*)

When 182 or more days have elapsed since the issuance of an initial dispositional order, grounds for termination exist under MCL 712A.19b(3)(c)(*i*) if "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." A parent's failure to resolve substance-abuse issues that negatively affect his ability to parent or cause a risk of harm to a child can establish sufficient grounds for termination. *In re Richardson*, 329 Mich App 232, 253-256; 961 NW2d 499 (2019). Additionally, the failure to resolve substance-abuse issues, the inability to provide adequate housing and financial support for a child, and continued involvement in criminal activity also support termination. *In re Frey*, 297 Mich App 242, 244-245; 824 NW2d 569 (2012). A respondent's mere inability to personally care for his children as a result of incarceration, however, does not alone constitute grounds for termination. *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010).

Respondent does not dispute that more than 182 days elapsed between the initial dispositional order issued on April 23, 2018, and the order terminating respondent's parental rights entered on June 7, 2022. Instead, respondent argues that this ground was not proven by clear and convincing evidence because respondent "was soon to be released enabling him to fully rectify all conditions that led to adjudication." Respondent explains that he obtained his GED, "completed several programs to improve his situation[,] and acquire[d] valuable skills in the trades." During his initial parole, respondent was employed, supported his children, and visited them "constantly." Although respondent recognizes he was incarcerated at the time of the initial adjudication and released, he explains that his "parole violations stemm[ed] from an old substance abuse problem resurfaced." To address this, respondent entered and successfully completed an intense substance abuse program after his reincarceration. In respondent's view, the trial court ignored his efforts to address the conditions that led to adjudication. Instead, it "seemed preoccupied . . . with [respondent's] second incarceration" without recognizing that he "successfully completed intensive drug treatment," had employment, and a residence.

We begin by noting that DHHS did not dispute that respondent completed the services initially ordered. Instead, it alleged that he failed to benefit from them. This Court has held that even if a respondent has participated in all the services offered, participation is not the same as overcoming the barriers justifying removal in the first place. See *In re Sanborn*, 337 Mich App 252, 274; 976 NW2d 44 (2021). Rather than merely cooperating and participating in services, a respondent must benefit from them. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

In this case, respondent testified that he might be released before the October 29, 2022 date the worker had obtained from respondent's case manager. Regardless, respondent ignores that the children spent over four years, more than half of their young lives, in care.

And although it is true that respondent was employed after he initially paroled, he did not "constantly" visit his children. Instead, respondent missed 16 of 45 visits, and his failure to timely cancel or attend visits caused distress for KRM.

Moreover, despite his recognition on appeal that his parole violation was the result of what he characterizes as an old, resurfaced substance abuse issue, during the termination hearing, respondent minimized his substance abuse. In fact, he testified that he did not "have a substance abuse problem prior to coming to prison." And he further testified that "because [he] had one dirty drop,[11] [he] had to do Advance[d] Substance Abuse Treatment . . . ." Respondent is correct that the parole board ordered him to complete an advanced substance abuse treatment program before he would be eligible for parole again given that, during respondent's initial imprisonment, he had already participated in Alcoholics Anonymous[12] and Narcotics Anonymous. Further, while initially out on parole, respondent told the worker that he availed himself of substance abuse therapy and drug screenings. Respondent's parole agent advised otherwise, reporting that respondent tested positive for methamphetamine. Respondent's parole agent also shared that he discovered evidence on respondent's phone that respondent was still using and selling drugs. Even early on in the advanced substance abuse program, respondent committed a controlled substance misconduct. Because respondent characterized his earlier methamphetamine use as a "mishap" and downplayed his prior substance abuse during his trial testimony, it remains questionable whether respondent has addressed this barrier to reunification with his children.

Turning to respondent's testimony that he had suitable housing, the record demonstrates that respondent refused to allow the worker to conduct home assessments on seven different occasions before eventually providing a home address on April 30, 2021. When respondent's parole agent accompanied the worker to the home assessment, the agent realized that respondent had provided him with a different home address for parole purposes. The worker conducted the home assessment at the address respondent provided to her. She determined the home was not suitable because it had no beds for the children and respondent would be residing with his father, who was a registered sex offender. When respondent testified, he admitted that his father was a convicted sex offender, but said he would protect his children from his father, who respondent claimed lived in the house next door to the home he had presented for assessment. During an earlier hearing, however, another worker testified that respondent previously told her he would move into the house where his father lived when his father moved out. Thus, respondent did not have an appropriate home for the children.

In sum, respondent's incarceration for drug offenses and his resultant inability to provide care and custody for the children led to the initial adjudication. Respondent's numerous parole violations, including three involving controlled substances, resulted in his subsequent imprisonment and continued inability to provide care for and support the children. Accordingly, respondent's substance use, inadequate housing, and continuing criminality factored into the court's decision to terminate his parental rights.

---

[11] Presumably respondent was referring to his positive test for methamphetamine.

[12] It appears that respondent recognized that alcohol is also an issue for him. Again, despite respondent's participation in prison services designed to address alcohol use, after he was released on parole, he drank, was arrested for drunk driving, and was reported to possibly have been drinking during the brutal assault on his significant other.

Respondent had ample time to address the issues leading to the removal of his children. Less than a year after his initial release from prison, respondent opted to repeatedly violate his parole, lied to the worker about the circumstances of his parole, refused seven different DHHS home assessments, failed to provide a suitable home for the children, and committed numerous criminal offenses.

In light of respondent's history, the trial court was legitimately concerned with respondent's long-term ability to remain sober in order to be available to provide adequate care for his minor children. Unfortunately, while there may have been progress in terms of respondent's compliance with the case service plan, the issues that led to adjudication continue to exist over four years later. Accordingly, the trial court did not clearly err when it found clear and convincing evidence that the conditions that led to adjudication continued to exist and that there was no reasonable likelihood that they could be rectified within a reasonable time considering the children's ages.[13]

## III. BEST INTERESTS

Respondent argues that the trial court clearly erred when it determined that termination of respondent's parental rights was in the children's best interests. We disagree.

"Even if the trial court finds that the Department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). This Court reviews a trial court's determination of best interests for clear error. *In re Sanborn*, 337 Mich App at 276. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights . . . ." MCL 712A.19b(5). In making its determination, the trial court "should weigh all the evidence available to it," and may consider

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. Other considerations include the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan. [*In re*

---

[13] Because only one statutory ground needs to be established to support termination of parental rights under MCL 712A.19b(3), we need not address respondent's challenges to the remaining statutory grounds. *In re Martin*, 316 Mich App 73, 90; 896 NW2d 452 (2016). Even so, we note that respondent raises the same argument as to why all four grounds were unsupported. For the reasons already discussed, review of the record demonstrates that the trial court did not clearly err in determining that the additional statutory grounds were proven.

*Atchley*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket Nos 358502 and 358503); slip op at 7, quoting *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks and citation omitted).]

Moreover, "[a] child's placement with relatives is a factor that the trial court is required to consider." *In re Gonzales/Martinez*, 310 Mich App at 434. While placement with a relative weighs against termination, it is not dispositive because a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012). In the majority of cases, it is in the child's best interests to be placed with siblings. *Id.* at 42.

The trial court did not clearly err when it determined that termination of respondent's parental rights was in the children's best interests. Respondent contends that the testimony presented at the termination hearing establishes the deep bond between him and the children and minimal concerns about respondent's parenting skills. While it is true that the worker testified that respondent's parenting skills appeared generally appropriate, and that the children recognized respondent as their father, there were also concerns about respondent's inconsistent parenting time, inadequate housing, substance use, and sporadic presence in his children's lives because of his incarceration. In particular, KRM struggled with the irregularity of visits with respondent and began displaying regressive behaviors with toileting and self-regulation following phone calls and parenting time. Moreover, the worker reported that KRM stated, "I don't like talking to daddy, but I won't tell him," and "sometimes I feel like I'm going to throw up when I talk to daddy." Furthermore, KRM did not talk about respondent and would hide under a bed when talking about her family.

Respondent acknowledges that he has a stronger bond with KAM, which is reflected in the frequency of his communication with KAM in contrast to KRM. Respondent stated that he had more contact with KAM than KRM because he was not able to obtain KRM's foster parents' phone number and relied on the worker to set up telephone visits. But respondent was able to write letters to the children and, after his reincarceration in April 2021, he wrote only two letters to KRM.

And the length of time that the children have been in foster care demonstrates that the termination of respondent's parental rights is in their best interests. For the past four years, KAM has been in 13 foster care placements because of ongoing mental health concerns and KRM has been in six. Both children have experienced physical and emotional harm since their initial removal and require extensive therapy and treatment, all while respondent committed numerous parole violations and found himself reincarcerated. While on parole, respondent failed to consistently visit the children and the last time they lived with him was in December 2017.

The trial court also recognized that KAM was the only child currently in relative placement because he is living with respondent's cousin. See MCL 712A.13(a)(j)(*ii*). Although respondent made some progress in addressing his issues, the record demonstrates that it was unlikely that KAM could be returned to his home within the foreseeable future, if at all. The worker opined that both children required stability. As already discussed, however, respondent remained incapable of providing care and a stable, permanent home. Respondent's reincarceration, history of substance use, inadequate housing, inconsistent parenting time, and other conditions

demonstrate that the trial court did not clearly err in determining that termination of respondent's parental rights was in KAM's best interests despite KAM's placement with a relative.

Both children were adjusting well in their current placements, and despite living separately, the children's foster care workers made efforts to allow them to meet on a monthly basis and to communicate regularly through video and phone calls. The children are in secure, structured, and safe environments, with caregivers willing to adopt them. KRM has continually been in her current licensed foster care home for approximately two years while KAM has been in his relative placement for approximately one year. At this point in time, continued reunification efforts are outweighed by the children's need for stability, permanency, and finality. Accordingly, the trial court did not clearly err by finding that termination of respondent's parental rights was in children's best interests.

Affirmed.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Anica Letica